### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on April 11, 2024**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | **Grand Jury Original** |
| | : | |
| **BENCE HORVATH** | : | **VIOLATIONS:** |
| | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| | : | |
| | : | |
| | : | **18 U.S.C. § 554** |
| | : | **(Smuggling)** |
| **Defendant.** | : | |
| | : | **50 U.S.C. § 4819** |
| | : | **(Export Control Reform Act)** |
| | : | |
| | : | **18 U.S.C. § 1956(a)(2)(A)** |
| | : | **(International Money Laundering)** |
| | : | |
| | : | **FORFEITURE** |
| | : | **18 U.S.C. §§ 982(a)(1) & (b)(1);** |
| | : | **21 U.S.C. § 853(p); and** |
| | : | **28 U.S.C. § 2461(c)** |
| | : | **50 U.S.C. § 4819(d)** |

## I N D I C T M E N T

The Grand Jury charges that:

At times material to this Indictment:

### The Defendants and Other Individuals and Entities

1.      Defendant BENCE HORVATH was a Hungarian citizen and was believed to reside in Spain.

1

2.      CO-CONSPIRATOR 1 was a Hungarian citizen and was believed to reside in Gibraltar and Switzerland. CO-CONSPIRATOR 1, whose identity is known to the Grand Jury, is also a relative of HORVATH.

3.      BUDAPHONE was a Russian telecommunications company based in Moscow. BUDAPHONE's line of business is the procurement of mobile radio communications. CO-CONSPIRATOR 1 exercises operational and overall control of BUDAPHONE, while HORVATH provides assistance in the day-to-day procurement activities of BUDAPHONE.

4.      CO-CONSPIRATOR 2, whose identity is known to the Grand Jury, was a Latvian citizen and was believed to reside in Latvia. In the past, CO-CONSPIRATOR 2 has provided freight handling and logistics services for BUDAPHONE, transporting their products into Russia.

5.      LATVIAN COMPANY 1, whose identity is known to the Grand Jury, was a Latvian-based freight forwarding company that has been in business since 2018. LATVIAN COMPANY 1's line of business is freight handling and shipping. CO-CONSPIRATOR 2 was the Corporate Director of LATVIAN COMPANY 1.

6.      Blacksaphhir Capital SL also known as Blacksaphir Capital ("BLACKSAPHIR") was a Spanish global trading and supply chain management company that has been in business since 2019. BLACKSAPHIR was operated by HORVATH.

7.      HUNGARIAN COMPANY 1 was a telecommunications company based in Hungary.

8.      RUSSIAN COMPANY 1 was a telecommunications company based in Moscow, Russia. RUSSIAN COMPANY 1 directly contracts with various Russian government entities and shares the same phone number and physical address as BUDAPHONE. HORVATH was a Deputy

Director of RUSSIAN COMPANY 1. Additionally, the Chief Executive Officer of RUSSIAN COMPANY 1 has been identified as an employee of the Ministry of Internal Affairs of the Russian Federation.

9.     U.S. COMPANY 1 was a U.S.-based company that designs, manufactures, and sells communications equipment, including radios.

10.     U.S. PERSON 1 was a United States citizen who owned and operated a small U.S.-based radio distribution business located in Massachusetts.

11.     SERBIAN COMPANY 1 was a company located in Serbia that HORVATH and his co-conspirators used for transshipment of goods to Russia.

### The Export Control Reform Act and Export Administration Regulations

12.     On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included the Export Control Reform Act ("ECRA"). *See* 50 U.S.C. § 4801 *et seq.* ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

13.     ECRA provided that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811. To that end, ECRA granted the President the authority to "(1) control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. 50 U.S.C. § 4812. ECRA granted to the Secretary of Commerce the authority to establish the applicable regulatory framework. 50 U.S.C. § 4813.

14.     Through the EAR, the U.S. Department of Commerce's ("DOC") Bureau of Industry and Security ("BIS") reviewed and controlled the export from the United States to foreign destinations of certain items. In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user and the end use of the item.

15.     The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use and end user of the item.

16.     Since Russia's full-scale invasion of Ukraine on February 24, 2022, BIS has implemented a series of stringent export controls that restrict Russia's access to the technologies and other items that it needs to sustain its attack on Ukraine. As of April 8, 2022, license requirements for exports, reexports and transfers to or within Russia were expanded to cover all items on the CCL. *See* 87 Fed. Reg. 12226 (Mar. 3, 2022); 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. § 746.8.

17.     Under ECRA, it was a crime to willfully violate, attempt to violate, conspire to violate or cause a violation of any regulation, order, license or authorization issued pursuant to the statute, including the EAR. *See* 50 U.S.C. § 4819(a)(l).

4

**The Commerce Control List Items**

18.     During the relevant time period, the below items were identified on the CCL, classified by BIS under the corresponding ECCN, and controlled for anti-terrorism reasons. As of February 24, 2022, an export license was required from the Department of Commerce to export or reexport each of these items to Russia, subject to limited exceptions not applicable here.

| Item | ECCN |
|---|---|
| DP4401e DIGITAL PORTABLE TWO-WAY RADIO SERIES | 5A992.c |
| DP4400e DIGITAL PORTABLE TWO-WAY RADIO SERIES | 5A992.c |
| DP4600e DIGITAL PORTABLE TWO-WAY RADIO SERIES | 5A992.c |

19.     U.S. COMPANY 1 manufactured the specific radios discussed in this Indictment including the models named in the paragraph above.  These radios had a rugged design, were submersible up to 1 meter for up to 30 minutes, and met military specifications 810C, 810D, 810E, 810F, and 810G, indicating that the radios met the Department of Defense standard for use in high and low temperature environments, solar radiation, rain, vibration, and shock.

**JURISDICTION AND VENUE**

20.     The conduct alleged in this Count occurred within the District of Columbia and elsewhere and is therefore within the venue of the United States District Court for the District of Columbia pursuant to Title 18, United States Code, Sections 3237(a).

## COUNT ONE

### (Conspiracy to Unlawfully Export Goods to Russia, and to Defraud the United States)

### THE CONSPIRACY

21.     Beginning at least in or around September 2022, and continuing through at least in or around May 2023, Defendant HORVATH did willfully combine, conspire, and agree with others known and unknown to the Grand Jury, including CO-CONSPIRATOR 1 and CO-CONSPIRATOR 2, to: (a) commit an offense against the United States, that is, to export and cause the exportation of goods from the United States to Russia, via third countries, in violation of the controls imposed upon exports to Russia by the United States government, without having first obtained the required licenses from BIS, located in the District of Columbia, in violation of Title 50, United States Code, Section 4819 and Title 15, Code of Federal Regulations, Sections 736.2 and 746.8; and (b) defraud the United States government by interfering with and obstructing a lawful government function, that is, the enforcement of laws and regulations controlling the export of goods from the United States by deceit, craft, trickery, and dishonest means, in violation of Title 18, United States Code, Section 371.

### GOALS OF THE CONSPIRACY

22.     The goals of the conspiracy were:

A.      to acquire goods from the United States for end users in Russia;

B.      to conceal from U.S. companies that the goods were destined for Russian end users;

C.      to evade export control regulations, prohibitions, and licensing requirements;

6

D.      to conceal the prohibited activities and transactions from detection by the U.S. Government so as to avoid penalties and disruption of the illegal activities; and

E.      to make a financial profit for the defendant and his co-conspirators.

## MANNER AND MEANS OF THE CONSPIRACY

23.      The manner and means by which the defendant and his co-conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

A.      The defendant and his co-conspirators planned and acted both inside and outside the United States to acquire goods for Russian end users.

B.      The defendant and his co-conspirators used e-mail, telephones, and secure messaging applications to communicate with one another and with other individuals, including individuals located in the United States, Latvia, Spain, Gibraltar, Switzerland, and Russia.

C.      The defendant and his co-conspirators purchased goods from companies in the United States for ultimate shipment to Russia.

D.      The defendant and his co-conspirators intentionally concealed from the United States Government and companies located in the United States the true nature of the ultimate end use and the true identities of the ultimate end users of the goods, by providing false and misleading information about the ultimate end use and end users.

E.      The defendant and his co-conspirators attempted to cause the goods to be exported from the United States to individuals and entities located in Russia through third countries, without obtaining a license from BIS, located in the District of Columbia.

## FAILURE TO OBTAIN REQUIRED LICENSES

24.     No person, including the defendant HORVATH, sought or acquired the appropriate license from BIS in order to lawfully conduct the commercial transactions, wire transfers, and related attempted shipments set forth in this Indictment.

## OVERT ACTS

25.     In furtherance of the above-described conspiracy, and in order to carry out the object thereof, the defendant and others known and unknown to the Grand Jury committed and caused to be committed, in the District of Columbia and elsewhere, at least one of the following overt acts, among others:

26.     HORVATH and CO-CONSPIRATOR 1 operated, controlled, and directed BUDAPHONE, RUSSIAN COMPANY 1, and BLACKSAPHIR from at least in or around September 2022 to May 2023 in furtherance of a scheme to obtain, fund, and illegally export controlled communications technologies to Russian end users.

27.     Furthermore, CO-CONSPIRATOR 2 operated, controlled, or directed LATVIAN COMPANY 1 from in or around at least September 2022 to May 2023 in furtherance of this scheme by attempting to illegally circumvent export controls by accepting and transshipping cargo to Russian end users on behalf of BUDAPHONE and RUSSIAN COMPANY 1.

28.     In or around May 2023, HORVATH and his co-conspirators, including CO-CONSPIRATOR 1, discussed their illicit scheme in a series of email messages, in which HORVATH explained on or about May 5, 2023 that to "accelerate [the procurement] process" the co-conspirators would sell radios manufactured by U.S. COMPANY 1 to "a Spanish company," *i.e.*, BLACKSAPHIR.

29. On or about May 9, 2023, one of HORVATH's employees and co-conspirators, who is known to the Grand Jury, explained that "the Spanish company [*i.e.*, BLACKSAPHIR] has to sell to [HUNGARIAN COMPANY 1]," which would then sell the goods to yet another company, SERBIAN COMPANY 1. The co-conspirator summarized the scheme in the same email: "The[n] most important, that when the goods leaves [*sic*] the country it comes from [HUNGARIAN COMPANY 1], goes to Serbia, enters the country, to [SERBIAN COMPANY 1] and after that to [RUSSIAN COMPANY 1] in Moscow."

30. Also on or about May 9, 2023, HORVATH told an employee and co-conspirator, who is known to the Grand Jury, via email to "ask [CO-CONSPIRATOR 2] to collect these 2 pallets [of U.S. COMPANY 1 radios] from Budapest."

### Business Involving U.S. PERSON 1

31. Beginning in or around January 2023, HORVATH and CO-CONSPIRATOR 1 began discussing a series of transactions and attempted transactions that involved procuring and exporting U.S. COMPANY 1 radios and accessories (*e.g.*, radio batteries, multiunit radio charging stations, and microphones) purchased from U.S. PERSON 1, from the United States and elsewhere to Russia via third countries, including Latvia (involving CO-CONSPIRATOR 2) and the United Arab Emirates. Some of these items were controlled for export and reexport to Russia, as described below.

32. On or about January 31, 2023, HORVATH emailed CO-CONSPIRATOR 2 with the subject line " Shipping from Dubai / Moscow." The body of the email stated, "The goods are in Dubai inside Free Trade Zone and we would like to buy it for [SERBIAN COMPANY 1], the Serbian company. After that, we would like to sell it to [RUSSIAN COMPANY 1] and ship to

Moscow." This email attached a sales order from U.S. PERSON 1 listing U.S. COMPANY 1 radios. Ultimately, this transaction was never completed.

33.     Beginning in or around March 2023, HORVATH continued discussions with U.S. PERSON 1 via email regarding the acquisition of U.S. COMPANY 1 radios and accessories for export from the United States. HORVATH knew that these radios and accessories ultimately were destined for Russia and Russian end users.

34.     On or about March 24, 2023, U.S. PERSON 1 emailed HORVATH about end-user information for certain U.S. COMPANY 1 radios, stating, "OK, I need to know End User country for [specific U.S. COMPANY 1 radios]. IF [U.S. COMPANY 1] quotes, the end user will need to complete that form."

35.     Later that same day, HORVATH responded to U.S. PERSON 1, saying, "Will ask and get back to you. If they don't provide, I will tell them they cannot do it without."

36.     Still later that same day, U.S. PERSON 1 responded to HORVATH, saying, "Those are US Export LAWS, its [sic] not like they have a choice. They either comply or there are no radios."

37.     Following the exchange of several more emails, on or about March 29, 2023, HORVATH wrote to U.S. PERSON 1, asking, "Equipment goes to Moscow for public safety use. The end user is the Moscow Police. I just realized that this equipment is actually not sanctioned [this statement is false], it's only [U.S. COMPANY 1] that decided to leave the market. Do you think we can still buy this stuff, or we give up?"

38.     That same day, U.S. PERSON 1 responded, "No Chance [sic] [.]"

**May 2023 Attempted Export of Radios and Accessories to Russia via Latvia**

39.     Beginning in or around March 2023, HORVATH continued email discussions with U.S. PERSON 1 regarding the acquisition of U.S. COMPANY 1 radios and accessories for export. In this series of email exchanges, HORVATH attempted to determine the availability of specific models of radios, to include the DP 4401e, DP 4400e, and DP 4600e radio models manufactured by U.S. COMPANY 1. These models would require a license issued by BIS for export to Russia.

40.     On or about March 27, 2023, U.S. PERSON 1 emailed HORVATH, asking, "[HORVATH] on your list that you wanted to order at the end of the month you had 10 [U.S. COMPANY 1 radios]. I have these in stock, do you still need them?? [signed U.S. PERSON 1]."

41.     Further emails between HORVATH and U.S. PERSON 1 discussed basic pricing and availability, with U.S. PERSON 1 confirming availability of the relevant radios as well as some of the accessories. During these exchanges, U.S. PERSON 1 asked HORVATH where the radios would be going so as to give a freight estimate, to which HORVATH replied that the goods would be shipped to Madrid, Spain.

42.     On or about March 30, 2023, U.S. PERSON 1 received a further reply from HORVATH, stating, "Hi [U.S. PERSON 1], We could potentially order this our self [*sic*], but cannot confirm until later tonight. Please stand by! Thanks."

43.     On or about March 30, 2023, HORVATH followed up, stating, "They are not answering, but give me 30 minutes and I will confirm the purchase of the DP Radios myself." He then included the model numbers he was interested in purchasing as the DP4401e, DP4400e, and DP4600e radios manufactured by U.S. COMPANY 1.

44.     Later that day, HORVATH sent a follow-up note to U.S. PERSON 1, stating, "Hi

[U.S. PERSON 1], Will buy these! Will send all the info tomorrow for the invoice."

45.    On or about March 31, 2023, HORVATH sent U.S. PERSON 1 the buyer and shipping information for the shipment of U.S. COMPANY 1 radios, listing the "bill to" as BLACKSAPHIR and listing the shipping address as a freight forwarder located in Riga, Latvia and operated by CO-CONSPIRATOR 2.

46.    On or about April 1, 2023, U.S. PERSON 1 advised HORVATH that the "[p]ower supply, compact mic[rophone], and RSM [remote speaker microphone] will come from Europe. Radios from South Africa. Chargers and batteries from USA."

47.    Later that same day, HORVATH responded, "Do you think we can try to ship that radios strait [sic] to Moscow? SA [South Africa] does not follow sanctions?" U.S. PERSON 1 did not respond to this message.

48.    On or about April 2, 2023, U.S. PERSON 1 sent HORVATH a new email that included three separate sales orders for a variety of U.S. COMPANY 1 radios and associated accessories. All of the sales orders list the "bill to" address as BLACKSAPHIR and the "ship to" address as the freight forwarder located in Riga, Latvia and operated by CO-CONSPIRATOR 2. One of the sales orders, Sales Order 25513, was for 170 units of three types of U.S. COMPANY 1 radios, the DP4401e, the DP4400e, and the DP4600e, in addition to related accessories. Those were the same three types of U.S. COMPANY 1 radios that HORVATH listed in his March 30, 2023 email, and subsequently asked U.S. Person 1 if such radios could be shipped directly from South Africa to Moscow. The total cost for Sales Order 25513 was $84,530.

49.    On or about April 3, 2023, HORVATH replied to U.S. PERSON 1's email, stating, "Hi [U.S. PERSON 1], I need your banking details for the transfer, it is not on the Sales Order.

Thanks [signed HORVATH]."

50.     U.S. PERSON 1 replied with a Word document that contained specific banking details for U.S. PERSON 1's relevant bank accounts, including account information and SWIFT information for international wire transfers.

51.     On or about April 24, 2023, a business owned by U.S. PERSON 1 received an international wire from BLACKSAPHIR in the amount of $97,664.

52.     On or about May 11, 2023, HORVATH caused U.S. PERSON 1 to ship the relevant U.S. COMPANY 1 radios from Miami, Florida to the freight forwarder located in Riga, Latvia operated by CO-CONSPIRATOR 2. Enclosed with the shipment was an invoice issued by a business owned by U.S. PERSON 1 – with invoice number 25513-1 – dated April 28, 2023, billed to BLACKSAPHIR and shipped to the freight forwarder located in Riga, Latvia operated by CO-CONSPIRATOR 2. This invoice was almost identical to the Sales Order 25513 document that U.S. PERSON 1 sent to HORVATH, with the exception that one of the listed U.S. COMPANY 1 radios was for a larger quantity, bringing the total order to 200 units. The amount of this invoice was listed as $97,664, which matches the wire amount received from Spain on April 24, 2023. This shipment was detained on export by U.S. Customs and Border Protection.

(**Conspiracy to Export U.S. Goods to Russia, via Third Countries, and to Defraud the United States,** in violation of Title 18, United States Code, Section 371)

## COUNT TWO

### (Attempted Smuggling of Goods to Russia via Latvia)

53.     The allegations in Paragraphs 1 through 56 are incorporated and realleged by reference in this Count.

54.     On or about May 11, 2023, within the District of Columbia and elsewhere, defendant HORVATH did knowingly and fraudulently attempt to export and send from the United States, merchandise, articles, and objects, specifically the DP 4401e, DP 4400e, and DP 4600e radio models manufactured by U.S. COMPANY 1, contrary to laws and regulations of the United States, to wit, ECRA and the EAR.

**(Attempted Smuggling Goods from the United States,** in violation of Title 18, United States Code, Section 554)

**COUNT THREE**

**(Attempted Unlawful Export of Goods to Russia via Latvia)**

55.     The allegations in Paragraphs 1 through 56 of this Indictment are incorporated and realleged by reference herein.

56.     On or about May 11, 2023, within the District of Columbia and elsewhere, defendant HORVATH did knowingly and willfully attempt to export and send the DP 4401e, DP 4400e, and DP 4600e radio models manufactured by U.S. COMPANY 1 from the United States to Russia via Latvia, without first having obtained the required license or written approval from BIS, which is located in the District of Columbia.

**(Attempted Unlawful Export of Goods from the United States,** Title 15, Code of Federal Regulations, Sections 736.2 and 746.8, Title 50, United States Code, Section 4819)

**COUNT FOUR**

**(International Money Laundering)**

57.     The allegations in Paragraphs 1 through 56 of this Indictment are incorporated and realleged by reference herein.

58.     On or about the following dates, within the District of Columbia and elsewhere, defendant HORVATH transported, transmitted, and transferred a monetary instrument or funds from a place outside the United States, namely bank accounts in Spain and elsewhere, to a place in the United States, namely bank accounts in the United States, with the intent to promote the carrying on of a specified unlawful activity, *i.e.*, violating the smuggling statute, 18 U.S.C. § 554.

59.     On or about April 24, 2023, defendant HORVATH caused an international wire to be sent from a Spain-based Banco Bilbao Vizcaya Argentaria Bank account in the amount of approximately $97,664 to a U.S.-based Citizens Bank account owned by U.S. PERSON 1, in promotion of a specified unlawful activity, namely smuggling.

(**International Money Laundering**, in violation of Title 18, United States Code, Section 1956(a)(2)(A))

### FORFEITURE ALLEGATION

60.     The allegations contained in Counts One through Four of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 28, United States Code, Section 2461(c).

61.     Pursuant to ECRA, Title 50, United States Code, Section 4819, and Title 28, United States Code, Section 2461(c), upon conviction of any violation of ECRA, the defendant shall forfeit to the United States any of the defendant's property: (i) used or intended to be used, in any manner, to commit or facilitate the violation; (ii) constituting or traceable to the gross proceeds taken, obtained, or retained, in connection with or as a result of the violation; or (iii) constituting an item or technology that is exported or intended to be exported in violation of ECRA.

62.     The allegations contained in Counts One through Four of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title

15

18, United States Code, Section 982(a)(1). Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1956, defendant HORVATH shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property. The United States will also seek a forfeiture money judgment for a sum of money equal to the value of any property, real or personal, which constitutes, or is derived from proceeds traceable to this offense.

63.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants,

    a. cannot be located upon the exercise of due diligence,

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be subdivided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1); and Title 28, United States Code, Section 2461(c).

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Sections 982(a)(1) & (b)(1); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

*Matthew M. Graves /SM*

Attorney of the United States in
and for the District of Columbia

16