UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BENCE HORVATH,<br><br>     Defendant. | Criminal Action No. 24-401 (JDB) |

**MEMORANDUM OPINION**

On September 4, 2024, a grand jury returned a four-count indictment charging Bence Horvath with conspiracy to violate U.S. export control laws and related offenses stemming from his attempt to export radios from the United States to Russia without a license. Before the Court is Horvath's motion to dismiss the indictment in its entirety for failure to state an offense. For the reasons explained below, the Court will deny Horvath's motion to dismiss.

**BACKGROUND**

The Bureau of Industry and Security ("BIS"), an agency within the Department of Commerce, oversees the nation's export control system. As is relevant here, the Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. §§ 4801–4852 (2018), delegates to the BIS the authority to regulate exports of certain categories of items and information. See generally 50 U.S.C. §§ 4814–15; 15 C.F.R. § 730.1 et seq. (2025) (the Export Administration Regulations ("EARs")). ECRA also makes it a crime to willfully "violate, attempt to violate, conspire to violate, or cause a violation of" ECRA or "any regulation, order, license, or other authorization issued" pursuant to ECRA, including the EARs. 50 U.S.C. § 4819(a)(1), (b); see Indictment [ECF No. 7] ¶ 17.

Although ECRA only permits regulation "to the extent necessary" to protect U.S. national security or to "further significantly" U.S. foreign policy goals or international obligations, id.

1

§ 4811(1), the EARs have a wide ambit, generally regulating "any item warranting control that is not exclusively controlled for export, reexport, or transfer (in-country) by another [federal] agency," 15 C.F.R. § 730.3. The EARs provide that the export, reexport, and in-country transfer of certain items is prohibited without a BIS license or exemption. See id. § 736.2(b). As part of its regulatory efforts, BIS assigns each export an Export Control Classification Number ("ECCN"); using the ECCNs, BIS places certain categories of items on the Commerce Control List ("CCL"), which is a list of items subject to the EARs. See Indictment ¶¶ 15–16; 87 Fed. Reg. 22130 (Apr. 14, 2022).

During the relevant period of September 2022 to May 2023, the EARs contained "a series of stringent export controls that restrict[ed] Russia's access to the technologies and other items that it need[ed] to sustain its attack on Ukraine," including the requirement to secure a BIS license prior to exporting goods on the CCL from the United States to Russia. See Indictment ¶ 16; 15 C.F.R. § 746.8 ("Sanctions against Russia and Belarus"). The parties agree that during the relevant period, the exports at issue—three types of two-way, portable radios—had ECCNs of 5A992.c and were on the CCL. See Indictment ¶¶ 9, 18–19; Mem. L. Supp. Mot. Dismiss Indictment [ECF No. 20-1] ("Mot.") at 5–6.

Bence Horvath is a non-U.S. citizen believed to reside in Spain. Indictment ¶ 1.[1] During the relevant period, Horvath operated the Spanish global trading and supply chain management company Blacksaphir Capital SL; assisted with the day-to-day procurement activities of Budaphone, a Moscow-based Russian company that procures mobile radio communications; and served as the director of "Russian Company 1," a Moscow-based telecommunications company

---

[1] "When considering a motion to dismiss an indictment, a court assumes the truth of th[e indictment's] factual allegations." United States v. Ballestas, 795 F.3d 138, 149 (D.C. Cir. 2015) (citing Boyce Motor Lines v. United States, 342 U.S. 337, 343 n.16 (1952)).

2

that has contracted directly with several Russian government entities.  Id. ¶¶ 3, 6, 8, 21, 26.[2] Horvath's relative, Co-conspirator 1, also "operated, controlled, and directed Budaphone, Russian Company 1, and Blacksaphir."  Id. ¶¶ 2, 26.  Budaphone and Russian Company 1 have the same phone number and physical address.  Id. ¶ 8.

During this period, Horvath, Co-conspirator 1, and Co-conspirator 2—a Latvian citizen who had "provided freight handling and logistics services for Budaphone"—allegedly "purchased goods from" U.S. Company 1, "provid[ed] false and misleading information" to "intentionally conceal[] from the United States Government" and U.S. companies "the true nature of the ultimate end use and the true identities of the ultimate end users of the goods," and "attempted to cause the goods to be exported from the United States to individuals and entities located in Russia" without a license.  See id. ¶¶ 4, 21, 23–24, 26–27.

The indictment alleges that the parties committed several overt acts in furtherance of the conspiracy.  In some instances, Horvath planned multi-step shipping routes between the United States and Russia to obfuscate the radios' ultimate destination.  See generally id. ¶¶ 28–32.  In January 2023, for example, Horvath emailed Co-conspirator 2 that his "goods [we]re in Dubai inside [the] Free Trade Zone," he sought to buy the goods for Serbian Company 1, and "[a]fter that, [h]e would like to sell [the goods] to [Russian Company 1] and ship to Moscow."  Id. ¶ 32.  Another time, Horvath emailed Co-conspirator 1 to propose "accelerat[ing] [the procurement] process" by selling U.S. Company 1 radios to "a Spanish company," which the government contends was Blacksaphir.  Id. ¶ 28.  The Spanish company, Horvath explained in his e-mail, would subsequently sell the radios to Hungarian Company 1, which would sell them to Serbian Company 1, which would sell them to Russian Company 1 in Moscow.  See id. ¶¶ 28–29.

---

[2] Where relevant, the Court uses the same pseudonyms as the indictment.

3

In other transactions, Horvath was straightforward in his desire to ship the radios to Russia. In March 2023, Horvath attempted to purchase radios and accessories from U.S. Person 1, who worked for U.S. Company 1. See id. ¶¶ 33–34. U.S. Person 1 asked for the end user information and stressed that Horvath must "comply" with United States export laws "or there [would be] no radios." Id. ¶ 36. Horvath admitted that the radios would "go[] to Moscow for public safety use" and that "[t]he end user is the Moscow Police." Id. ¶ 37. When Horvath asked, "[d]o you think we can still buy this stuff, or we give up?" U.S. Person 1 responded, "No Chance." Id. ¶¶ 37–38.

Not too long after, Horvath again tried to purchase radios from U.S. Person 1. This time, Horvath told U.S. Person 1 that the radios would be shipped to Spain. Id. ¶ 41. But when U.S. Person 1 mentioned that the radios would be shipped from South Africa, Horvath asked whether the parties could "try to ship that radios strait [sic] to Moscow" since South Africa "does not follow sanctions." Id. ¶¶ 46–47. Horvath agreed to purchase the radios, and on March 31 he gave Blacksaphir's Spanish address for billing and Co-conspirator 2's Latvian freight forwarder as the address for shipping. Id. ¶ 45. On April 2, U.S. Person 1 sent Horvath a confirmation for three sales orders (one for each type of radio) that totaled $84,530. Id. ¶ 48. On April 3, Horvath requested U.S. Person 1's bank account information for payment, and around April 24, Blacksaphir transferred $97,664 to U.S. Person 1's business bank account. Id. ¶¶ 49–51.

In May 2023, U.S. Customs and Border Protection detained a shipment of U.S. Company 1's radios from the United States to the Latvian freight forwarder. Id. ¶ 52. The shipment contained an invoice from a business owned by U.S. Person 1 with the billing address as Blacksaphir and the shipping address as the freight forwarder. Id. Although the shipment's sales order provided for 200 radios rather than the 170 included in the April 2 sales order, the total price of the shipment was $97,664—the same amount as Blacksaphir's April 24 payment. Id.

4

Authorities arrested Horvath in August 2024. See Arrest Warrant [ECF No. 5] at 1. The grand jury returned a four-count indictment in September, charging Horvath with conspiracy to unlawfully export goods to Russia and to defraud the United States, attempted smuggling of goods to Russia via Latvia, attempted unlawful export of goods to Russia via Latvia, and international money laundering. See Indictment ¶¶ 21–59. Horvath has filed a motion to dismiss, which the parties have fully briefed. See Mot.; Gov't Resp. Def.'s Mot. Dismiss Indictment [ECF No. 21] ("Opp'n"); Def. Bence Horvath's Reply [ECF No. 22] ("Reply").³ The motion is now ripe for decision.

## **LEGAL STANDARDS**

"An indictment need only contain a 'plain, concise and definite statement of the essential facts constituting the offense charged.'" United States v. Safavian, 429 F. Supp. 2d 156, 158 (D.D.C. 2006) (quoting Fed. R. Crim. P. 7(c)). An indictment is "sufficiently specific where it (1) contains the elements of the offense charged and fairly informs the defendant of those charges so that he may defend against them, and (2) enables him 'to plead acquittal or conviction in bar of future prosecutions for the same offense.'" Id. (quoting Hamling v. United States, 418 U.S. 87, 117–18 (1974)).

A criminal defendant may move to dismiss an indictment in its entirety or as to certain charges prior to trial if there is a "defect in the indictment," such as the "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v); see United States v. Cotton, 535 U.S. 625, 631 (2002). But this is a limited ground for seeking relief. "An indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charge on the merits."

---

³ Horvath requested oral argument pursuant to Local Rule 47(f). See Mot. Dismiss Indictment [ECF No. 20] at 1. Because the Court concludes that the parties' briefings are sufficient to resolve the motion on the papers, the Court will deny the request. See LCrR 47(f) (granting a request for an oral hearing "shall be within the discretion of the Court").

Safavian, 429 F. Supp. 2d at 158 (quoting Costello v. United States, 350 U.S. 359, 363 (1956)). Thus, only in "'unusual circumstances' is pretrial dismissal of the indictment possible on sufficiency-of-the-evidence grounds, and that is 'where there are material facts that are undisputed and only an issue of law is presented.'" Id. (quoting United States v. Yakou, 428 F.3d 241, 247 (D.C. Cir. 2005)); see also United States v. Ballestas, 795 F.3d 138, 148 (D.C. Cir. 2015) (dismissing an indictment is disfavored because it "directly encroaches upon the fundamental role of the grand jury" (quoting Whitehouse v. U.S. Dist. Ct., 53 F.3d 1349, 1360 (1st Cir. 1995))).

Finally, because the Fifth Amendment makes "[a]dherence to the language of the indictment [] essential," United States v. Akinyoyenu, 199 F. Supp. 3d 106, 110 (D.D.C. 2016) (quoting United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001)), a court considers only "the face of the indictment and, more specifically, the language used to charge the crimes," id. (quoting United States v. Sunia, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (emphases omitted)).

## ANALYSIS

The grand jury charged Horvath with violations of four federal laws: conspiracy to unlawfully export goods to Russia and to defraud the United States (18 U.S.C. § 371), attempted smuggling of goods to Russia via Latvia (18 U.S.C. § 554); attempted unlawful export of goods to Russia via Latvia (50 U.S.C. § 4819(a)), and international money laundering (18 U.S.C. § 1956(a)(2)(A)). To determine whether the indictment states an offense as to each charge, the Court must determine whether the indictment contains "allegations [that], if proven, would be sufficient to permit a jury to find that the crimes charged were committed." United States v. Bowdoin, 770 F. Supp. 2d 142, 146 (D.D.C. 2011) (citing United States v. Sampson, 371 U.S. 75, 76 (1962)). In other words, the indictment must allege each element of each charged offense.

Here, Horvath challenges one element that each offense shares: that Horvath acted contrary to U.S. law by intentionally seeking to export controlled items without a required BIS license, in

6

violation of 15 C.F.R. § 746.8(a).  See Indictment ¶¶ 21, 54, 56, 59.[4]  That regulation provides: "[f]or the purposes of paragraphs (a)(1) and (2) of this section, commodities . . . classified under ECCN[] 5A992 . . . do not require a license to or within Russia or Belarus for the following civil end-users," with a list including "joint ventures" between companies headquartered in country groups that include Spain and Latvia.  15 C.F.R. § 748.6(a).[5]  Subsection (a)(1) then provides that "[a] license is required . . . to export, reexport, or transfer (in-country) to or within Russia or Belarus any item subject to the EAR and specified in any [ECCN] . . . on the CCL."  Id. § 746.8(a)(1).

The indictment adequately alleges Horvath violated § 746.8(a).  The indictment alleges that each type of radio at issue had an ECCN on the CCL, Indictment ¶¶ 9, 18–19; Horvath sought to export the radios to Russia, id. ¶ 21; and the exemptions in paragraph § 746.8(a) were "not applicable," id. ¶ 18.  These allegations include "the elements of the offense[s] charged and fairly inform[] the defendant of those charges so that he may defend against them."  Safavian, 429 F. Supp. 2d at 158.  Indeed, Horvath has already identified possible defenses.

Horvath contends that the indictment's statement that the exceptions are "not applicable" is "legally incorrect."  Mot. at 6.  But the government is allowed to make some legal conclusions in an indictment, and "it is not necessary for the indictment to state exactly how [a defendant's]

---

[4] See 18 U.S.C. § 371 ("two or more persons conspire . . . to commit any offense against the United States"); id. § 554 ("Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any [good] . . . contrary to any law or regulation of the United States . . ."); id. § 1956(a)(2)(A) ("Whoever . . . transfers . . . or attempts to . . .transfer . . . a monetary instrument or funds . . . from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States. . . with the intent to promote the carrying on of specified unlawful activity . . ."); 50 U.S.C. § 4819(a)(1) ("It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this subchapter or of any regulation" issued under ECRA.).

[5] Although the relevant substance of 15 C.F.R. § 746.8 has remained the same since the period of Horvath's charged conduct, the section's structure has changed.  Compare 15 C.F.R. § 746.8(a), with 15 C.F.R. § 746.8 (Jan. 1, 2023), https://perma.cc/Y866-QH6X, and 15 C.F.R. § 746.8 (May 23, 2023), https://perma.cc/L8SZ-4JCT.  The Court quotes from and cites to the sections of the C.F.R. as they existed during the period of Horvath's charged conduct.

conduct satisfies each element of the offense." United States v. Kelley, Crim. A. No. 22-408 (CKK), 2024 WL 4512395, at *4 (D.D.C. Oct. 17, 2024); see, e.g., United States v. Resendiz-Ponce, 549 U.S. 102, 109 (2007) ("[A]n indictment parroting the language of a federal criminal statute is often sufficient."); Hamling, 418 U.S. at 117–18 (collecting cases). Indeed, the inquiry is "not whether [the indictment] could have been made more definite and certain, but whether it contains the elements of the offense intended to be charged, 'and sufficiently apprises the defendant of what he must be prepared to meet.'" Hagner v. United States, 285 U.S. 427, 431 (1932) (quoting Cochran v. United States, 157 U.S. 286, 290 (1895)). And here, it does.

Horvath also briefly claims (1) the indictment must (and failed to) allege the "five types of facts" that 15 C.F.R. § 736.2(a) states "determine [one's] obligations," including license requirements, under various EARs; and (2) U.S. Person 1, not Horvath, had the obligation to secure the license under § 758.3(a). See Mot. at 9. Both arguments fail.

To start, the paragraph of § 736.2 to which Horvath points—§ 736.2(a)—does not state an offense. It merely lists and briefly explains the types of general facts that pertain to a license determination, such as the item's ECCN and end user and destination. Section 746.8 then applies these facts to explain when a license is required in the context of that section, with some of those facts relevant to the underlying license requirement and others applicable to various exemptions. See § 746.8. Indeed, § 736.2(a) itself directs readers to "see other parts of the EAR where the license requirements and other restrictions are specified in greater detail." And, as previously explained, the indictment pleads the facts necessary to establish a violation of the license requirement in § 746.8(a).

Looking further down in § 736.2, the indictment sufficiently alleges a violation of § 736.2(b)(6). See Indictment ¶ 21 (alleging Horvath acted "without having first obtained the

required licenses from BIS . . . in violation of . . . Sections 736.2 and 746.8"); id. ¶ 56 (similar). Subsection 736.2(b) provides the EAR's "ten general prohibitions." 15 C.F.R. § 736.2(b). Section 746.8 falls within "General Prohibition Six," which states that a party "may not, without a license or license exception . . . export, reexport, or transfer (in-country) any item subject to the EAR to a country or region . . . that is embargoed by the United States or otherwise made subject to controls"). Id. § 736.2(b)(6)(i); see also id. (referencing § 746.8). For the reasons that the indictment alleges a violation of the narrower § 746.8(a), it thus also alleges a violation of § 736.2(b).

Turning to Horvath's second brief argument, assuming arguendo that U.S. Person 1 had the obligation to secure the license does not change the adequacy of the indictment as to the charged conduct. Horvath had an independent obligation to comply with the EAR. See id. § 758.3 ("[a]ll parties that participate in transactions subject to the EAR must comply with the EAR"). Horvath is charged with acting contrary to law by violating federal regulations that require an export license. See Indictment ¶¶ 21, 54, 56, 59; see also 15 C.F.R. §§ 736.2, 746.8. The indictment avers that Horvath "intentionally concealed . . . the true nature of the ultimate end use and the true identities of the ultimate end users of the goods by providing false and misleading information" to U.S. Person 1, which impeded U.S. Person 1's ability to adequately assess whether the exports required a license. See, e.g., Indictment at ¶¶ 22, 23(D). Then, Horvath attempted to export those goods without a license. Id. ¶ 52. In other words, the indictment alleges that Horvath knowingly concealed details relevant to the license analysis; based on that misrepresentation, the parties to the transaction did not secure a license for the radios; and Horvath then knowingly attempted to export the radios absent a license. That is sufficient to allege that Horvath acted contrary to federal regulations requiring a license, which is all that the charged conduct requires.

9

Horvath's final argument is that the indictment still fails to state an offense because its factual allegations, accepted as true, demonstrate that Horvath met two exemptions to the license requirement. In his view, the indictment thus fails to allege the element that he sought to export controlled items contrary to law. See generally Mot. at 2–4; Reply at 1–2.[6] But see Indictment ¶ 18 (the license exemptions are "not applicable" to Horvath's conduct). Horvath's argument again fails. The indictment does not plead facts demonstrating that Horvath met either exemption. Both exemptions apply only to exports that are destined for certain end users. See 15 C.F.R. § 746.8(a); (permitting certain exports to Russia for enumerated "civil end-users"); id. § 740.19(a), (b)(9), (c)(1)(i), (c)(i)(ii), (c)(2)(iii) (in a cross-reference from § 746.8(c)(7), permitting certain exports "to and for the use of independent non-governmental organizations in . . . Russia" or to eligible "individuals," which exclude Russian government entities and officials). But Horvath himself argues that the indictment does not identify the end users for the radios. See Mot. at 8 ("[T]he Indictment does not identify any end-user or end-use for the charged conduct, instead vaguely alluding to unspecified 'Russian end users.'"); see also Indictment ¶ 23(E) (exports "to individuals and entities located in Russia"). The indictment cannot both fail to identify end users and identify eligible end users for the purposes of meeting an exemption.

Furthermore, even considering the end users that the government and Horvath have inferred from the indictment, the indictment does not plead facts that they are civil end users, non-governmental organizations, or eligible individuals. Compare Indictment ¶ 37 (Horvath stating for a contemporaneous transaction that "[t]he end user is the Moscow Police"), and Opp'n at 9

---

[6] At times, Horvath also seems to frame his motion as arguing that the government has the burden to plead facts disproving the applicability of statutory and regulatory exemptions. See Mot. at 8; Reply at 11–12. This is a tenuous argument. See, e.g., United States v. Durrani, 835 F.2d 410, 420–22 (2d Cir. 1987) (explaining framework for analyzing license exemptions). The Court will analyze the argument as Horvath most often and clearly frames it, which is "whether a license was required by law to export the two-way radios at issue in this case, based solely on the allegations within the four corners of the Indictment." Reply at 2.

10

("[I]f the Defendant's words to his co-conspirator can be trusted, they were bound for the 'Moscow Police.'"), with 15 C.F.R. § 740.19(c)(1)(ii) ("the Russian Government" and "organizations administered or controlled by the . . . Russian Government . . . are not eligible end users"), and id. § 740.19(c)(2)(iii) (defining "[i]neligible Russian Government officials" to include "employees of the Ministry of Interior" and "offices, services, agencies and other entities organized under or reporting to the federal government"); compare Mot. at 10 (assuming the "ultimate purchaser[s]" were Budaphone and Russian Company 1), with Indictment ¶ 8 (alleging Russian Company 1, which has the same phone number and address as Budaphone, has as its chief executive officer "an employee of [Russia's] Ministry of Internal Affairs" and "directly contracts with various Russian government entities"), and § 740.19(c)(1)(ii), (c)(2)(iii). The indictment therefore does not plead facts that Horvath met either exemption, and once again, the indictment adequately states an offense as to each charge.

## CONCLUSION

The indictment "contains the elements of the offense charged," "fairly informs the defendant of those charges so that he may defend against them," and "enables him to plead acquittal or conviction in bar of future prosecutions for the same offense." Safavian, 429 F. Supp. 2d at 158 (internal quotation marks omitted). Additionally, the indictment makes "allegations [that], if proven, would be sufficient to permit a jury to find that the crimes charged were committed." Bowdoin, 770 F. Supp. 2d at 146. This case is thus not one of the limited and "unusual circumstances" in which the Court may "directly encroach[] upon the fundamental role of the grand jury" and dismiss the indictment. Ballestas, 795 F.3d at 148.

For these reasons, the Court will deny the defendant's motion to dismiss. A separate Order will issue on this date.

/s/

JOHN D. BATES
United States District Judge

Dated: February 11, 2025