## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No.: 1:24-cr-00401-JDB-1** |
| **BENCE HORVATH,** | ) ) | |
| **Defendant.** | ) ) ) | |

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Bence Horvath has spent his life navigating complex and unpredictable courses, both professionally and personally. No experience better exemplifies the resilience and character he has developed than the nearly two years he spent sailing around the world with his young family as his crew. This journey, filled with turbulent seas, unexpected obstacles, and the need for unwavering emotional control, required a unique blend of problem-solving, adaptability, and ultimate acceptance of forces beyond his control. It was an education in staying the course. The challenges of this federal criminal case, much like the roughest seas, have tested that resilience beyond anything he could have imagined. Yet, through this process, he has gained a profound clarity on what truly matters—family, integrity, and personal growth—and has found a sense of calm he has never experienced before.

In pleading guilty to conspiracy to violate U.S. export laws, Bence accepts full responsibility for his serious lapse in judgment. He pursued a business opportunity to help his mother, and his desire for professional success led him to turn a blind eye to legal boundaries. The consequences have been immediate and severe: his life has been upended, and he has been incarcerated in a foreign country 7,000 miles from his wife and children since his arrest

on August 23, 2024. Instead of breaking him, this experience has served as a catalyst for transformation. It has led him to mentor fellow inmates and earn the most trusted inmate position within the facility. It has given him a renewed sense of purpose. In this case and for this defendant, a sentence of time served is sufficient but not greater than necessary to achieve the statutory purposes of punishment as required by 18 U.S.C. § 3553(a).

## PROCEDURAL HISTORY

On June 17, 2025, Mr. Horvath appeared before the court and, pursuant to a written plea agreement, entered a guilty plea to Count One of the indictment, which charges him with conspiracy to unlawfully export goods to Russia in violation of 18 U.S.C. § 371. The statutory maximum sentence is a term of imprisonment of up to five years, a fine of up to $250,000, and a period of supervised release of not more than three years. Sentencing is scheduled for September 30, 2025.

## LEGAL FRAMEWORK

In sentencing a defendant, the district court must first calculate and consider the applicable range pursuant to the United States Sentencing Guidelines. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018); *United States. v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006). The Guidelines, however, are not binding on the sentencing court. *See United States v. Booker*, 543 U.S. 220, 245 (2005). Nor are they the only consideration; the court must consider all of the factors under 18 U.S.C. § 3553(a) in fashioning a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing. *Gall*, 552 U.S. at 49-50. This requires an individualized assessment of each defendant. *Id.* at 50. Indeed, "[i]t has been uniform and constant in the federal judicial tradition

for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

## APPLICABLE GUIDELINE RANGE

In its Presentence Investigation Report (PSR), the United States Probation Office correctly calculates the guideline range at 37 to 46 months based on a total offense level of 21. PSR, ECF No. 33,[1] at ¶¶ 55, 113. The calculation starts with a base offense level of 26, pursuant to U.S.S.G. §§ 2M5.1(a)(1) and 2X1.1(a), as agreed to by the parties. *Id.* at ¶ 45. There is a three-level reduction for acceptance of responsibility under §§ 3E1.1(a) and (b), and an additional two-level reduction because Mr. Horvath is a Zero-Point Offender, §§ 4C1.1(a) and (b). *Id.* at ¶¶ 50-55. Bence has no criminal history whatsoever, resulting in a total criminal history score of zero and a criminal history category of I. *Id.* at ¶ 58.

## OBJECTIONS TO THE GUIDELINE RANGE

The government objects to the PSR's calculation of the guideline range and asks the court to impose a four-level sentencing enhancement pursuant to § 3B1.1(a).[2] For the reasons outlined in Mr. Horvath's response to the government's PSR objections, which he incorporates herein by reference, the government cannot meet its burden of proving this

---

[1] Citations are to the initial PSR. As Standing Order No. 25-49 restricts electronic access to sealed documents, and defense counsel is located in Roanoke, Virginia, counsel does not yet have a copy of the final PSR, which must be obtained in person from the United States Probation Office in Washington, D.C. However, defense counsel is prepared to review the final PSR with Mr. Horvath prior to sentencing on September 30.

[2] In the plea agreement, the parties agreed to litigate the applicability of any aggravating role enhancement under §3B1.1. Plea Agreement, ECF No. 30.

aggravating role enhancement by a preponderance of the evidence, and its objection should be overruled.

Mr. Horvath was an essential but subordinate participant in this scheme, not a leader. His mother, Margarita Ficzere, maintained full operational control of Budaphone and Promsvyazradio LLC (PRSV). Bence had no managerial responsibility, no signatory authority, no ability to hire, fire, or recruit employees, and made no business decisions. He held no authority over any other participants in the criminal activity and was not "hierarchically superior to his co-conspirators." *United States v. Singh*, 195 F. Supp. 3d 25, 34 (D.D.C. 2016). Importantly, he did not receive *any* financial benefit from his actions, a factor the Guidelines deems significant. *See* U.S.S.G. § 3B1.1 cmt. n.4. There is no evidence that he exercised control over anyone in connection with this criminal activity. As such, Bence is ineligible for an aggravating role enhancement. *United States v. Bapack*, 129 F.3d 1320, 1324 (D.C. Cir. 1997) (control over a scheme rather than over a participant in the scheme does not warrant § 3B1.1 adjustment).

## REQUEST FOR DOWNWARD DEPARTURE

The Sentencing Reform Act of 1984 allows judges to depart from the Guidelines and sentence outside the prescribed range if a case presents atypical features. U.S.S.G., Ch. 1, Pt. A, § 2. Indeed, § 3553(b) authorizes courts to make downward departures to adjust for "aggravating or mitigating circumstance[s] of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission…." *See* U.S.S.G. Ch. 1, Pt. A, § 4(b); *id.* at § 5K2.0(a). These mitigating circumstances include factors unrelated to moral blameworthiness. *United States v. Smith*, 27 F.3d 649, 652-53 (D.C. Cir. 1994). Two grounds justify departing

downward in this case: (1) Mr. Horvath's status as a deportable alien, pursuant to *Smith*; and (2) those outlined in Application Note 3(A) of § 2M5.1.[3]

### 1. **Mr. Horvath is entitled to a** Smith **departure.**

Even before the Supreme Court's decision in *Booker* authorized sentencing courts to vary from the Guidelines, this Circuit recognized "a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence." *Smith*, 27 F.3d at 655. Mr. Horvath, a non-citizen alien, is ineligible for participation in specific programs and for other considerations in the Bureau of Prisons (BOP). According to BOP's Policy Statement 5100.08, Chapter 5, page 9, deportable aliens "shall be housed in at least a Low security level institution." *See* https://www.bop.gov/policy/progstat/5100_008.pdf (last visited September 23, 2025). He is therefore ineligible for placement in minimum security facilities. Additionally, Mr. Horvath is ineligible for the benefits of prerelease custody pursuant to 18 U.S.C. § 3624(c)(1), which directs BOP, to the extent practicable, to "ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months) under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community." To that end, § 3624(c)(2) authorizes BOP to place a prisoner in home confinement for up to six months, noting prisoners with lower risk levels should be placed on home confinement "for the maximum amount of time permitted under this paragraph."

---

[3] These two grounds equally justify a variance, and Mr. Horvath also presents that argument as an alternative basis for sentencing him below the applicable guideline range.

Considering the public safety factors outlined in Chapter 5, page 7 of BOP Policy Statement 5100.08, Mr. Horvath would likely have been eligible for minimum security detention but for the fact that he is a deportable alien. He is not a member of a disruptive group or a sex offender; he is not violent; he has not made threats to government officials, escaped from a secure facility, caused a prison disturbance, engaged in juvenile violence, or seriously abused the telephone; he has not been convicted of an offense in the "greatest severity" range; and his maximum statutory sentence is less than 10 years. *Id.* His alienage limits his access to a minimum-security facility, as well as community confinement, under § 3624(c). *See Smith*, 27 F.3d at 654. This increases the severity of his sentence compared to similarly situated non-alien defendants, and a *Smith* departure is warranted here.

### 2. A downward departure is warranted under Application Note 3(A) to § 2M5.1.

Mr. Horvath stipulated to a base offense level of 26 pursuant to U.S.S.G. § 2M5.1(a)(1).[4] *See* Plea Agreement, ECF No. 30, at 2. This section of the Guidelines applies "if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded; or (B) the offense involved a financial transaction with a country supporting international terrorism." The evasion of national security controls drives the application of § 2M5.1(a)(1) in this case. *See generally* Statement of Offense, ECF No. 31.

The commentary to § 2M5.1 provides grounds for a downward departure upon consideration of the degree to which the violation threatened a U.S. security interest, the

---

[4] U.S.S.G. § 2M5.1(a)(2) provides for a base offense level of 14 "otherwise," but it is unclear when, if ever, this guideline applies.

volume of the commerce involved, the extent of planning or sophistication, and whether there were multiple occurrences. *See* U.S.S.G. § 2M5.1, cmt. n.3(A). Several of these factors are present to an extreme degree in Mr. Horvath's case, warranting a downward departure.

A.

There is no dispute that the United States' sanctions against Russia fall under a generalized "national security interest" described by the Bureau of Industry and Security (BIS) as "primarily targeting the Russian defense, aerospace, and maritime sectors," when first announced in late February 2022. *See* 87 Fed. Reg. 12226 (Mar. 3, 2022). But in the context of Application Note 3(A) to § 2M5.1(a)(1), this broad "national security" category demands closer analysis.

BIS's own regulations label certain "reasons for control" for each item on the Commerce Control List (CCL), in order to identify the specific potential security risk the item could pose to U.S. interests. Those interests are varied and are not limited to national security concerns. The BIS labels include:

> *Reasons for Control.* Reasons for Control are: Anti-Terrorism (AT), Chemical & Biological Weapons (CB), Chemical Weapons Convention (CW), Crime Control (CC), Encryption Items (EI), Firearms Convention (FC), Missile Technology (MT), National Security (NS), Nuclear Nonproliferation (NP), Regional Stability (RS), Short Supply (SS), Significant Items (SI), Surreptitious Listening (SL) and United Nations sanctions (UN). Items controlled within a particular ECCN may be controlled for more than one reason.

15 C.F.R. § 772.1; *see also* 15 C.F.R. § 738.2(d)(2)(ii)(A). The radios at issue in this case (ECCN 5A992.c) are regulated by BIS for Anti-Terrorism (AT) purposes only. *See* Statement of Offense, ECF No. 31, at ¶ 23. AT is the most common and widely applicable reason for

control and is applied to a wide range of items, including tractors (ECCN 9A990) and life jackets (ECCN 8A992.i). *See* 15 C.F.R. Part 774. Notably, these radios are not labeled by BIS for National Security (NS),[5] Missile Technology (MT), Chemical & Biological Weapons (CB), Chemical Weapons Convention (CW), or Nuclear Nonproliferation (NP). *See id.*

But for the foreign policy decision to subject Russia to such expansive sanctions, the two-way radios at issue here would not be (and have never been) subject to any export license requirement. *See* 15 C.F.R. § 738.4(a)(2)(ii)(B); Supplement No. 1 to 15 C.F.R. § 738 – Commerce Country Chart (excerpts from May 11, 2022).[6] Merely being listed on the CCL and regulated under the Export Control Reform Act (ECRA) doesn't mean the United States has a national security (rather than a foreign policy) interest for purposes of § 2M5.1(a)(1). That's not to say the United States doesn't possess important interests in regulating the export of dual-use technologies, like the two-way radios at issue. However, § 2M5.1 gives the court a wide berth to consider where Mr. Horvath's attempted shipment of 200 commercial two-way radios (that ordinarily would not require any license at all) falls on the spectrum of criminal conduct that threatens a security interest of the United States.

---

[5] Importantly, by not having the NS designation, the radios at issue would not "make a significant contribution to the military potential of any other country or combination of countries that would prove detrimental to the national security of the United States." 15 C.F.R. § 742.4(a) (defining NS label).

[6] As outlined in Mr. Horvath's Memorandum in Support of his Motion to Dismiss, these radios and all other 5A992.c items may be excepted for certain end-users from the sanctions-related license requirements pursuant to the Commercial Communications Device (CCD) exception found at 15 C.F.R. § 740.19 and 15 C.F.R. § 746.8(c)(7) (May 23, 2023 version).

B.

Additionally, the volume, extent, and scope of Mr. Horvath's conduct also support a downward departure under Application Note 3(A) to § 2M5.1. Mr. Horvath engaged in just four transactions involving approximately 200 two-way radios and accessories. Statement of Offense, ECF No. 31. These transactions occurred within a roughly five-week period between April 17, 2023, and May 26, 2023. *Id.* at ¶ 24. The total value of all transactions was less than $190,000—far less than the millions (if not tens of millions) of dollars involved in many export conspiracies charged by the federal government and subject to a base offense level of 26 pursuant to § 2M5.1(a)(1). *See* discussion, *infra*.

The degree to which Mr. Horvath's conduct threatened a security interest of the United States, as well as the limited scope, volume, frequency, and value of criminal activity, pale in comparison to what was at stake in other comparator cases where courts departed or varied below the guidelines. *See United States v. Sevilla*, No. 04 CR 0171, 2006 WL 3486872 (N.D. Ill. Nov. 29, 2006) (departing 14 offense levels based on minimal volume of commerce, lack of terroristic intent, and involvement of items that did not threaten the proliferation of nuclear, biological, or chemical weapons); *United States. v. Groos*, No. 06 CR 420, 2008 WL 5387852 (N.D. Ill. Dec. 16, 2008) (holding the text of Application Note to § 2M5.1 indicates that a downward departure can be appropriate and departing downward from a base level of 26 to a level 20, finding conduct did not seriously threaten the security of the United States).

As in *Sevilla* and *Groos*, a downward departure (or variance) pursuant to Application Note 3(A) of § 2M5.1 is warranted and appropriate in this case.

9

## ANALYSIS OF § 3553(a) FACTORS AND REQUEST FOR
## DOWNWARD VARIANCE

While a sentencing court must begin its analysis by calculating the Guidelines, the court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007) (citing *Booker*, 543 U.S. 220); *accord Gall*, 552 U.S. at 596-97. Rather, the court must make an individualized assessment based on the facts presented. *Gall*, 552 U.S. at 597. In so doing, § 3553(a) instructs district courts to consider, *inter alia*, the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, the need for deterrence, and the protection of the public. Courts must also consider the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 U.S.C. § 3553(a)(6). These § 3553(a) factors justify a downward variance to time served (~ 13 months) in this case for this defendant.

1. **The circumstances of this offense and the characteristics of this defendant justify a downward variance.**

Bence is fundamentally a creator, not a destroyer. He is an entrepreneur at heart, driven by a genuine passion for building and creating. This drive propelled him to extraordinary success early in his career, culminating in the purchase of Agencia de Servicios de Mensajería SLU (ASM) at the age of 33. At the time, ASM was a struggling logistics company operating at a loss of €500,000 per month. Over the course of seven years, Bence successfully transformed ASM into Spain's largest parcel distribution network, involving 500 agencies and 150,000 daily transactions. This success, however, came with a crushing and self-imposed pressure. Bence viewed himself not just as a business owner but as a guardian of 3,000 families

who relied on him. The stakes were incredibly high, leaving him caught in a relentless rat race and with a profound sense of imposter syndrome.

### A.

In 2016, Bence sold ASM to General Logistic Systems Spain SL (GLS), a subsidiary of the British Royal Mail, for €70 million. Bence grossed approximately €17 million from the sale, with €2 million allocated to pay fees and various commissions. Struggling with the immense physical and mental strain his career had placed on him and his family, he took a two-year sabbatical. He joined several young professional organizations, including two non-profits focused on social entrepreneurship, and bought a 50-foot sailboat. Neither Bence nor his wife had prior sailing experience; after earning the necessary licenses at sailing school, Bence hired a captain to teach him practical seamanship during an Atlantic crossing. Upon completing the voyage, his family joined him in St. Lucia. From there, he assumed the role of captain and spent the next 20 months circumnavigating the globe with his family as his crew.

Sailing an ocean proved to be a lot like entrepreneurship—both require the same key skills: emotional control, resilience, patience, and acceptance. The ability to maintain the course through difficult circumstances depends on these core competencies.

Ultimately, the COVID-19 pandemic forced Bence's return to Spain in 2020 due to port closures. He then explored the cryptocurrency market, engaging in several ventures. But the crypto market crashed in 2022, and Bence lost everything he had invested.

### B.

In February, 2022, Russia invaded Ukraine. The following month, a Spanish court issued a ruling in a civil lawsuit related to Bence's ownership share in ASM. The plaintiff in

that lawsuit alleged that Bence had granted him a call option contract for 30% of the ASM shares, which the plaintiff claims he timely exercised. The court ordered Tractive Gestión SL, Mr. Horvath's holding company, to pay the plaintiff €17.5 million in damages plus interest. Bence appealed this ruling, and the appeal remains pending.

C.

In September 2022, Bence traveled to Russia at his mother's urging to explore his next opportunity. She convinced him that he could find success turning around a Russian company in crisis, as he had done so successfully in Spain, given the instability of the Russian market. Bence had no professional ties to Russia and had not been to Russia since he lived there as a child.

A prisoner of his own ambition, burdened by a relentless pressure to find the next success, Bence explored a number of potential career opportunities in Moscow, from a cookie startup to a children's multimedia digital park franchise to a brick manufacturer. He considered enrolling in a PhD program focused on science-based entrepreneurship that trains individuals to launch and run science-based startups.

While he was finding his way, his mother, Margarita Ficzere, asked him to assist her with her Moscow-based company Torgoviy Dom Venrus Trade, which served as a contracting partner of the Hungarian Export Promotion Agency (HEPA).[7] Given his fluency in English, Hungarian, Russian, and Spanish, along with his connections to European markets, Ms. Ficzere believed her son could help with the HEPA partnership and facilitate connections

---

[7] HEPA is a non-profit organization established by the Hungarian government to promote trade relations between Hungarian companies and countries of the former Soviet bloc.

between Russian and Hungarian businesses. Bence explored various potential investment opportunities and acted as a consultant, attempting to connect Hungarian companies with potential Russian buyers. He held no ownership interest in Torgoviy Dom Venrus Trade and received no compensation for his work, although he hoped to earn commissions if he was able to broker deals.

At his mother's request, Bence also helped her and her company Promsvyazradio LLC (PRSV) acquire Motorola radios and accessories needed to fulfill pre-invasion contracts. Meanwhile, PRSV's business development team was pursuing new agreements with both private and public Russian clients, including upgrading a Moscow police communications center and providing radio and communication devices to a large Moscow construction firm. Although he used the title "deputy director" in some PRSV emails to try to secure contracts and source goods, Bence did not have any ownership stake in PRSV, nor did he receive a salary or compensation from his mother's business. He has also never been paid for work he did while in Russia.

In his effort to help his mother source Motorola radios and accessories, Bence discussed various potential transactions from late 2022 through May 2023 with an individual he later learned was a confidential informant for the U.S. government. None of the deals discussed with the confidential informant was ever consummated. Instead, his mother reconnected with an American Motorola channel partner, C.D., whom she had worked with thirty years prior.

Because he spoke English fluently, Bence first served as an intermediary between his mother and C.D.[8] Bence attempted to procure Motorola radios and accessories from C.D. for his mother. This conduct gives rise to the instant offense of conviction. To expedite the transactions with C.D., Bence used Blacksaphir, a Spanish investment and trade company owned and operated by his friend and colleague, to procure and pay for the goods using funds from his mother's liquidated Hungarian investment. Bence's friend authorized the use of Blacksaphir in exchange for a commission from any transactions. When the radios and accessories purchased from C.D. were seized at the U.S. border, Bence paid his friend the expected commission out of his own pocket. Bence never received any salary, commission, or profit of any kind from the transactions referenced in the Statement of Offense and, instead, personally absorbed the loss of the failed transactions.

## D.

An extraordinary set of circumstances led to the commission of this offense. Bence was not out looking to push legal boundaries. Instead, he turned a blind eye to the complex legal parameters surrounding an opportunity to assist his mother with her business in Russia. This was a grave error, and he has accepted the consequences that have followed.

This singular misstep must also be viewed within the context of the rapidly changing global economy and geopolitical landscape. The charges stem from a unique situation in which common commercial goods, like two-way radios, were subject to an indecipherable web of

---

[8] Neither Ms. Ficzere nor C.D., referred to in the indictment as U.S. Person 1, has been prosecuted.

U.S.-based export and re-export controls (and possible exceptions and exemptions), as well as fluctuating EU-imposed controls.

i.

The specific radios at issue can still be bought online across the globe and are designed for communications uses on construction sites, by building security and maintenance personnel and concert and sporting venues, and can be used recreationally by hikers, skiers, boaters, and the like.[9] Prior to the issuance of Russian sanctions, these kinds of radios were shipped daily directly from Motorola factories and authorized resellers (such as C.D.) to companies like PRSV without the need for any BIS licenses. These radios are likely exempt from license requirements for certain end users even in Russia, pursuant to the Commercial Communications Devices (CCD) exception found at 15 C.F.R. § 740.19 and 15 C.F.R. § 746.8(c)(7) (May 23, 2023 version). *See* Memorandum in Support of Motion to Dismiss, ECF 20-1, at 6, 11-14.

ii.

The complexity of the regulatory schemes at issue played a central role in the offense conduct. In the first year of the war, the EU issued 10 separate sanctions packages. As of July 2025, 18 packages of sanctions have been imposed against Russia.[10] During the time period

---

[9] *See, e.g.*, Motorola DP4400e UHF VHF Digital Two Way Radio Walkie Talkie, AnyRadios.com, available at https://www.anyradios.com/product/motorola-dp4400e-radio/ (last visited Sept. 25, 2025).

[10] *See* Timeline - EU sanctions against Russia, European Council of the European Union, available at https://www.consilium.europa.eu/en/policies/sanctions-against-russia/timeline-sanctions-against-russia/ (last visited Sept. 25, 2025); *see also* EU sanctions in response to the situation in Ukraine, Issued by Dep't of Transp., Republic of Ireland, available at

relevant to the indictment, the EU issued three new sanctions packages and BIS amended its Russian sanctions provisions three times.[11] While it is always the responsibility of the parties to a transaction to stay abreast of these rapid changes, it is important to view Mr. Horvath's conduct within the regulatory context. While Bence had domestic logistics experience from his work with ASM, he had never previously navigated such an evolving regulatory framework, much less U.S. and EU sanctions.

iii.

Bence should have recognized the complexity of the situation at hand. Unfortunately, he moved forward and conducted four radio transactions in five weeks. Once he realized the waters into which he had sailed were not navigable, and U.S. authorities raised questions about the two-way radios, Bence immediately abandoned the venture and returned to live with his wife and children, telling his mother that her companies would not be able to procure Motorola radios at all. *Cf. United States v. Voissem*, 1:19-cr-20693-PAS (S.D. Fla. Jan. 2022) (defendants attempted to ship four dual-use scuba regulators to Libya after being told several times by federal authorities that it was illegal). In the end, Bence spent eight months away from his family between 2022 and 2023, only to lose money, time, and now over a year of his freedom, all for four transactions in a five-week period totaling less than $190,000.

---

https://www.gov.ie/en/department-of-transport/publications/eu-sanctions-in-response-to-the-situation-in-ukraine/ (last visited Sept. 25, 2025).

[11] *See* 15 C.F.R. § 746.8, Timeline, available at https://www.ecfr.gov/current/title-15/subtitle-B/chapter-VII/subchapter-C/part-746/section-746.8 (last visited Sept. 25, 2025). The Timeline feature of eCFR shows BIS has amended the Russian sanctions regulations 15 times between March 3, 2022 and November 1, 2024.

iv.

Bence's life has been a bumpy path of highs and lows, a reality that stands in stark contrast to the superficial successes he has achieved. He comes from humble and arduous beginnings. Raised by an abusive father, he endured a deeply unsettled childhood, including being uprooted from his home country and brought to the Soviet Union during the Cold War. In the Soviet Union, he was an outsider, an experience underscored by the vivid memory of being forced to wear a blue scarf in a sea of red. This experience, along with receiving foreign aid in the form of powdered milk and SPAM, has impacted him in ways he is only now beginning to fully appreciate. Suffice it to say, Bence is no friend to Russia.

For more than a year now, Bence has been separated from Blanca, his wife of nearly 20 years, and their three children, Alejandro, Lucia, and Gabriel. The letters in support of Bence, written by his family and friends and submitted for the court's consideration, describe him as a devoted husband, a loving father, and a man of character, courage, and commitment. *See* Exhibit A. As his close friend Chris Akbari explained, Bence is focused on "a desire to create a better future—not only for his children, but for his broader community." Like Mr. Akbari, Bence respectfully asks you consider his "strong character, dedication to his family, and history of good citizenship" when pronouncing his sentence.

### 2. A sentence of time served accomplishes the goals of sentencing.

Conspiracy to violate the U.S. export laws is a serious offense, and the Guidelines,

which start at a base offense level of 26, reflect its gravity. Bence has taken full responsibility for his conduct. Since his arrest at the San Francisco airport in August, 2024,[12] he has been incarcerated in a foreign country half a world away from his wife and children. He has lost his freedom and his reputation. This process, which has come with a substantial financial burden and brought a profound sense of personal shame, has been a significant punishment.

Bence's thirteen months behind bars in a foreign land have completely reoriented him. Being incarcerated excised everything from his life that had previously held him captive. The relentless pursuit of commercial success and the need for external validation have been replaced by a focus on his core values. He has come to realize that the true measure of a human is not the prestige or social standing from professional achievement, but what one does with that success and how it informs one's own values.

Thirteen months of incarceration in a foreign country serves the statutory purpose of affording adequate general deterrence. As for specific deterrence, the risk of recidivism is zero. This experience has been transformational for Bence. He has committed himself to personal growth and has demonstrated this by mentoring other inmates—two in particular, whom he set on their own journeys of self-development and reflection. He also was appointed POD trustee shortly after arriving at the Northern Neck Regional Jail, and then promoted to floor and kitchen trustee. He was recently promoted again to officer dining room trustee, the most trusted job in the facility, and the highest position he could aspire to as a federal inmate. *See* Exhibit B.

---

[12] Bence had arrived at SFO for a conference at Stanford University, unrelated to any of the charged conduct.

Bence's window of tolerance has widened beyond his wildest dreams, leaving him with a profound sense of calm. With a newfound drive to create for himself—rather than for external validation—he will return to his wife and children in Dubai to pursue his passion. The exact form his work will take is still unknown, but his motivation is clear.

Mr. Horvath poses no ongoing threat to society or risk of re-offending. This conduct was an aberration, stemming from an extraordinary set of circumstances and a significant lapse in judgment. To impose further punishment in this case would be redundant and serve no purpose intended by Congress in enacting § 3553.

### 3. A time-served sentence avoids unwarranted sentence disparities.

Section 3553(a)(6) directs the court to consider the need to avoid unwarranted sentence disparities among similarly situated defendants in fashioning an appropriate sentence. A sentence of time served is sufficient but not greater than necessary to accomplish the goals of sentencing and avoid unwarranted sentence disparities, as evidenced by the cases below.[13]

 *i.* <u>United States v. Grinin</u>, *No. 1:22-cr-00409-HG (E.D.N.Y. Aug. 2025)*

*Grinin*, a recent case out of the Eastern District of New York, confirms that time served is an appropriate, fair, and proportionate sentence in Mr. Horvath's case. In *Grinin*, three members of an extensive international procurement and money laundering network operating on behalf of Russian intelligence services, pleaded guilty to an array of charges including Conspiracy to Defraud the United States (18 U.S.C. § 371), Conspiracy to Commit Bank Fraud (18 U.S.C. §§ 1349, 1344), Conspiracy to Violate ECRA (50 U.S.C. § 4819), and Conspiracy to Commit Wire Fraud (18 U.S.C. §§ 1349, 1343).

---

[13] In all of these cases, the defendants' Guidelines were calculated using U.S.S.G. § 2M5.1(a).

1.

Defendants Nikolaos Bogonikolos, Alexey Brayman, and Vadim Yermolenko participated in a vast and lengthy international scheme known as the Serniya Network, involving evasion of export controls, wire fraud, bank fraud, and money laundering, to surreptitiously ship millions of dollars' worth of prohibited goods including "tens of thousands of rounds of ammunition suitable for military uses, as well as advanced electronics and sophisticated testing equipment used in quantum computing, hypersonic and nuclear weapons development and other military and space-based military applications." Case No. 1:22-cr-00409-HG, ECF No. 220, at 2-3. These goods were purchased in the United States, repackaged, and shipped by the defendants with falsified documents to various shell companies controlled by the Serniya Network, which were part of OFAC's Specially Designated Nationals and Blocked Persons list as of March 2022. In one of several transactions, Alexey Brayman shipped a "military grade spectrum analyzer … which could be used to measure electromagnetic signals on the battlefield or for countersurveillance operations…." *Id.* at 4.

While Brayman arranged for shipment and altered certificates of origins and declaration forms to conceal the scheme, Yermolenko served "as the money man for the U.S.-based node of the conspiracy." *Id.*, ECF No. 217, at 3. Yermolenko created at least eight shell companies and opened numerous bank accounts, using false statements to the financial institutions about the true purpose of the accounts. *Id.* at 4. He then followed the instructions of a Russian-based co-conspirator to deceive the banks about the purpose of wire transfers, stating: "if the bank asks what the payment is for—for bicycle spare parts, sporting goods and textile products."

*Id.* In fact, the payment was for highly sensitive deep-sea navigation and communications equipment destined for OFAC-sanctioned Russian end-users. *Id.*

Bogonikolos, a Greek national, used his Greek company, the Aratos Group as a cover for purchasing and shipping prohibited goods to the Serniya Network. *Id.*, ECF No. 204, at 3. In one such transaction, Bogonikolos procured "export-controlled lasers produced by a California-based manufacturer, which were sought for defense related quantum technologies in Russia." *Id.* He also purchased a "high-electron mobility transistor" for the National Research Nuclear University of the Moscow Engineering Physics Institute, as well as numerous "tactical military antennas" used on armored vehicles for a sanctioned entity, though he claimed the antennas were for use on recreational and tourist boats in the Netherlands. *Id.* at 3-4.

2.

Despite participating in a sprawling six-year conspiracy involving millions of dollars laundered through eight shell companies and the export of goods to a host of OFAC-sanctioned military and intelligence entities in Russia, the longest sentence imposed was 30 months' imprisonment for Yermolenko, who pleaded guilty to three felony counts (§ 371 Conspiracy, Bank Fraud Conspiracy, and ECRA Conspiracy). With a total offense level of 22, and a criminal history category I, Yermolenko's Guidelines range was 41 to 51 months.

Bogonikolos was sentenced to time served on July 7, 2025, after having been arrested in France on May 2, 2023, and extradited to the United States on April 18, 2024. In total, Bogonikolos spent 11 months in French custody and 14 months in U.S. custody. Like Yermolenko's, Bogonikolos' Guidelines were 41 to 51 months.

For his part, Brayman was sentenced to 24 months of supervised probation, after pleading to one count of § 371 Conspiracy. Brayman's total offense level was 19 with a criminal history category I, resulting in a Guidelines range of 30 to 37 months.

3.

Unlike the three defendants in the *Grinin* conspiracy, Mr. Horvath did not export millions of dollars of goods to OFAC-sanctioned entities through a complex web of shell companies as part of a larger, multi-year international scheme. Rather, Mr. Horvath found himself in between business ventures when his mother asked him to assist with her legitimate radio business, which was an authorized Motorola channel partner that had achieved great success for thirty years prior to Russia's invasion of Ukraine in early 2022. Margarita Ficzere's radio businesses were not criminal export syndicates dealing with OFAC-sanctioned buyers.

The factual differences between this case and *Grinin*, specifically the scope, size, and type of export violations charged in the *Grinin* conspiracy, compel a less significant sentence for Bence Horvath than Yermolenko (30 months) and Bogonikolos (25 months) received. A sentence of time served in Mr. Horvath's case would be proportional to the conduct at issue and prevent any unwarranted sentence disparities with the *Grinin* defendants.

    *ii.*    <u>United States v. Haimovich</u>, *No. 24-20374-CR-MARTINEZ/SANCHEZ (S.D. Fla. Feb. 2025)*

In September 2024, Gal Haimovich, pleaded guilty to one count of § 371 Conspiracy for exporting to Russia over $2 million worth of aircraft parts, including sensitive air data modules and air data and inertial reference units, controlled under the BIS Commerce Control List (CCL) as "missile technology." Haimovich owned and operated an Israeli freight forwarding company as part of a broader network of companies known as Control Towers

International. After the United States imposed sanctions on Russia following the invasion of Ukraine, Haimovich, using an alias, engaged in nearly 200 shipments of sensitive aircraft and aircraft navigation parts to an OFAC-listed end user, using a host of affiliate companies to conceal the end user and destination. In one such transaction, Haimovich warned his co-conspirators that the air data and inertial reference units were "very sensitive [*sic*] components and can raise lots of red flags." Case No. 24-20374-CR, ECF No. 56, at ¶ 1(p).

Haimovich was sentenced to 24 months, followed by three years of supervised release. *Id.*, ECF No. 97.[14] Haimovich paid a $15,000 fine and the full forfeiture amount of $2,024,435.44 at sentencing and also forfeited various aircraft parts and components seized as part of the government's investigation.

The conduct at issue in *Haimovich* was far more extensive in scope, volume, and reach than the conduct charged in the instant case. In the few pleadings available in *Haimovich*, the government details 177 transactions between March 2022 and May 2023, resulting in numerous exports of sensitive "missile technology" valued at over $2 million to at least one OFAC-listed entity in Russia. Here, Mr. Horvath engaged in a total of four transactions for portable two-way radios and accessories[15] totaling less than $190,000. The radios at issue were seized before leaving the United States, and all units have been forfeited. A sentence of time

---

[14] The government also filed a § 5K1.1 motion seeking a sentence reduction of 15% of Haimovich's sentence. Because the relevant documents are sealed, details about Haimovich's guidelines calculations and the impact of the 5K motion are unknown. Assuming Haimovich received a 15% reduction as recommended by the government, he received a credit of roughly 4.2 months' imprisonment.

[15] Notably, none of the accessories at issue in this case are on the CCL.

served in this case would be proportional to Haimovich's 24-month sentence given the relative extent of the conduct at issue.

      *iii.*     <u>*United States v. Besedin*</u>, *No. 2:23-cr-00770-DWL (D. Ariz. Dec. 2024)*

In May 2023, the United States indicted Oleg Patsulya and Vasiliy Besedin, both Russian nationals living in the United States, on Conspiracy (18 U.S.C. § 371), Attempted Smuggling (18 U.S.C. § 554(a)), Conspiracy to Violate ECRA (50 U.S.C. § 4819), and Conspiracy to Commit International Money Laundering (18 U.S.C. §§ 1956(h), 1956(a)(2)) charges. The defendants and others in Russia, Turkey, and elsewhere conspired to actively solicit opportunities with Russian aircraft companies to purchase controlled aircraft parts from suppliers in the United States. To effectuate the scheme, Patsulya opened several bank accounts, created a company in the United States called MIC-P&I LLC, and solicited several Russian companies, claiming he could procure U.S.-origin aircraft parts and ship those goods to Russia despite U.S. sanctions imposed on Russia. Patsulya and his several Russia-based co-conspirators "used shell companies in Turkey and Turkish bank accounts to conceal and promote [their] scheme." Case No. 2:23-cr-00770-DWL, ECF No. 49, at 13. In total, Patsulya used at least two U.S.-based Chase Bank accounts to launder $4,582,288.51 sent from Russian companies through shell Turkish companies and shell Turkish bank accounts to purchase and ship controlled aircraft parts without BIS licenses. *Id.*

Patsulya used a portion of these laundered funds to purchase over $250,000 worth of luxury vehicles, including a 2023 BMW 740i and a 2007 Sea Ray Sundance 380 Cruiser boat named "Side Chick." *Id.*, ECF No. 97, at 2-8. The government also seized from Patsulya a host of other luxury items, including diamond cufflinks, a gold chain from Saks Fifth Avenue,

luxury Louis Vuitton bags, and at least sixty-three categories of export-controlled aircraft parts he intended to sell to Russia. *Id.*

### 1.

On April 4, 2024, Patsulya pleaded guilty to Conspiracy to Violate ECRA and Conspiracy to Commit International Money Laundering. *Id.*, ECF No. 49. Patsulya also forfeited the specific property discussed above as well as $4,582,288.51. *Id.* Patsulya admitted that he initiated the criminal conspiracy and later recruited his co-defendant Besedin, another Russian national Patsulya knew in South Florida, to help source aircraft parts from American suppliers. *Id.* Patsulya was sentenced to 70 months, followed by 36 months of supervised released.[16] *Id.*, ECF No. 105. No fine was assessed.

### 2.

Patsulya's U.S.-based co-conspirator, Vasiliy Besedin, pleaded guilty to one count of Conspiracy to Violate ECRA. *Id.*, ECF No. 46. Besedin confirmed that from June 2022 through May 2023, "when I was residing in South Florida, Patsulya enlisted my help in locating various airplane parts and components and purchasing them for resale to various entities." *Id.* Besedin also knew Patsulya was receiving Russian money laundered through Turkey to purchase the U.S.-based items, and Besedin admitted that some of those funds "Patsulya paid me [Besedin] for my help in locating and obtaining airplane parts…." *Id.* Patsulya also paid Besedin's travel expenses (to Arizona, Texas, and Massachusetts) to meet potential suppliers. *Id.*

---

[16] The judgment specifically recognized that Patsulya would be subject to supervised release only "if not deported…." Case No. 2:23-cr-00770-DWL, ECF No. 105, at 2.

Notably, Besedin explained in a public filing that he had served as a teacher and swim coach for Patsulya's children and was later employed by Patsulya in a prior failed swimming pool business. *Id.*, ECF No. 67, at 2. Once he was hired by MIC-P&I LLC and joined the conspiracy, Besedin primarily assisted Patsulya by "interpreting/translating for Patsulya due to Patsulya's limited fluency in English." *Id.* Besedin took issue with the PSR's statement that he was a "business partner" with Patsulya, as Besedin had no ownership in any of the companies involved and received unstructured pay when Besedin told Patsulya he needed money for expenses such as rent. *Id.* at 3.

On December 16, 2024, Besedin was sentenced to 24 months, followed by 36 months of supervised release, pending potential deportation. Besedin's special assessment was remitted, and a fine was waived. *Id.*, ECF No. 79.

Though the conspiracy charged in the instant case is much narrower in scope and value, the role played by Besedin in Patsulya's lucrative criminal scheme bears similarities worth noting. Like Besedin, Mr. Horvath joined his mother's conspiracy in part due to his proficiency in several languages, including English. Like Besedin, Mr. Horvath did not create any companies or own any shares in his mother's companies that formed part of the scheme. But Besedin, unlike Mr. Horvath, joined Patsulya's conspiracy knowing it was specifically created and designed for the sole purpose of procuring, selling, and exporting controlled items unlawfully. And Besedin, unlike Mr. Horvath, was paid for his work and traveled far and wide in furtherance of the scheme.

iv.    <u>*United States v. Voissem*</u>, *Case No. 1:19-cr-20693-PAS (S.D. Fla. Jan. 2022)*

In October 2019, Peter Sotis and Emilie Voissem were indicted on charges of § 371 Conspiracy to Export Items in Violation of IEEPA (to Libya), Export and Attempted Export of Goods in Violation of IEEPA (50 U.S.C. §§ 1705(a) & (c)), and Smuggling (18 U.S.C. § 554(a)). Voissem was also individually charged with making false statements to federal authorities in violation of 18 U.S.C. § 1001(a)(2). The charges against Sotis and Voissem arose from their sale and attempted shipment of over $100,000 of specialized scuba rebreathers and related equipment to Libya without obtaining the necessary licenses, despite BIS officials having specifically instructed Sotis and Voissem to pause the sale and shipment until a license determination could be made. After a seven-day jury trial, Voissem was acquitted on the false statement count, but Sotis and Voissem were found guilty on the three remaining charges.

Sotis, who had prior felony convictions, faced a guidelines range of 121 to 151 months. Case No. 1:19-cr-20693-PAS, ECF No. 137, at 2. He was ultimately sentenced to 57 months, followed by three years of supervised release. *Id.*, ECF No. 156. Voissem, a former sheriff's deputy with no prior criminal history, faced Guidelines of 78 to 97 months. *Id.*, ECF No. 149, at 4. Voissem was sentenced to 5 months, followed by three years of supervised release. *Id.*, ECF No. 155.

After being convicted by a jury, Voissem spent just five months in prison for attempting to ship four dual-use scuba regulators to Libya, despite being told several times by federal officials that it was illegal to do so. Her sentence reflects the fact that she became involved in the conspiracy, in part, due to her desire to assist her then-boyfriend, Sotis, and also considers her otherwise law-abiding life. Like Voissem, Mr. Horvath engaged in this

unlawful conduct at the behest of a loved one, his mother, who had operated a successful radio business in Moscow for 30+ years. A downward variance is appropriate for Mr. Horvath, as it was for Voissem.

      *v.*      *Other Comparable Cases*

The overwhelming body of case law involving unlawful export offenses confirms that a sentence of time served in Mr. Horvath's case is proportional to the conduct at issue and would not result in unwarranted sentence disparities:

| Caption | Case No. | District | Offense | Facts | USSG Range | Sentence |
|---------|----------|----------|---------|-------|------------|----------|
| *U.S. v. Toussi* | 1:19-cr-00235-MAD | N.D.N.Y. | Conspiracy to Violate IEEPA, 50 U.S.C. §§1705(a) & (c) | Iranian national shipped $3M in turbine parts for power generation over 9-year conspiracy | 46-57 months | Time served (14.5 months) |
| *U.S. v. Goltsev* | 1:23-cr-00452-LDH | E.D.N.Y. | Conspiracy to Violate ECRA, 50 U.S.C. § 4819 | Russian national conspired with known, OFAC-sanctioned Russian military suppliers to ship 250 orders valued at over $7M using multiple sham U.S. companies. Shipments included electronic items and chips listed as Tier 1 on Common High Priority Items List issued by BIS, because they are used in advanced Russian precision-guided weapons systems. Exported items were found in Russian tanks and | Unknown | 40 months |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | drones on battlefield in Ukraine. | | |
| *U.S. v. Tourino* | 8:18-cr-00046-JLS | C.D. Cal. | Conspiracy to Violate IEEPA, 50 U.S.C. §1705 | Tourino and his company sold and shipped nearly $8M worth of controlled IBM servers to two Iranian banks, one of which was separately on OFAC's list for enabling and supporting terrorism | 24-30 months[17] | 18 months |
| *U.S. v. Semerene* | 1:21-cr-20589-DMM | S.D. Fla. | Conspiracy to Violate IEEPA, 50 U.S.C. §1705(a) | Three-year scheme to purchase aircraft parts to support OFAC-sanctioned Venezuelan oil company | 30-37 months | 30 months |
| *U.S. v. World Mining & Oil Supply, et al.* | 4:19-cr-00150-RSB | S.D. Ga. | Conspiracy to violate ECRA, IEEPA, 18 U.S.C. § 371 | Multi-year, eight-defendant conspiracy to ship over $20M in power turbines to Russia | unknown | 51 months (Bagrou)<br><br>28 months (Villone)<br><br>28 months (Nikitin) |
| *U.S. v. Gromacki* | 1:12-cr-00302-ER | S.D.N.Y. | 50 U.S.C. § 1705(a), 18 U.S.C. § 981(a)(1), 18 U.S.C. § 2 | Conspiracy to ship 6,000 pounds of carbon fiber to China and continued efforts to ship another $1.3M of carbon fiber after license had been revoked | 46-57 months | 3 months |

---

[17] The government agreed to a 6-level reduction as part of the plea agreement in Tourino's case because of his age and failing health. Probation calculated Tourino's sentencing range as 46-57 months.

| *U.S. v. Behroozian* | 2:16-cr-00185-JLG | S.D. Ohio | 50 U.S.C. §1705(a) | For 12+ years, Behroozian shipped hundreds of thousands of dollars' worth of pipeline and oil related goods to Iran, a designated state sponsor of terrorism | 46-57 months | 20 months |
| *U.S. v. Caby, et al.* | 1:16-cr-20803-BB | S.D. Fla. | 18 U.S.C. § 371 | 12-defendant conspiracy to export aircraft parts to Syria in violation of IEEPA and Syrian Sanctions | 46-57 months | 12 months + 1 day (Marjan Caby)  24 months (Arash Caby)  24 months (Ali Caby) |

## SUPERVISED RELEASE

Mr. Horvath is not a citizen of the United States. Upon his release from custody, he will be deported to Spain. A a period of supervised release is unnecessary in this case, as he will not reside in a federal judicial district. Nor will he reside in a country that shares a border with the United States. Reentry is simply not a concern here. As such, Mr. Horvath respectfully asks the court not include a period of supervised release as part of the judgment in this case.

## CONCLUSION

For all of these reasons, Mr. Horvath respectfully submits that a sentence of time served is sufficient but not greater than necessary to achieve the statutory purposes of punishment as required by 18 U.S.C. § 3553(a).

Respectfully submitted,

*/s/ Justin M. Lugar*
Justin M. Lugar
VSB No. 77007
Woods Rogers PLC
10 S. Jefferson Street, Suite 1800
Roanoke, VA 24011
Telephone: 540.983.7620
Justin.lugar@woodsrogers.com

*/s/ Kristin B. Johnson*
Kristin B. Johnson
VSB No. 71115
Woods Rogers PLC
10 S. Jefferson Street, Suite 1800
Roanoke, VA 24011
Telephone: 540.983.7511
kristin.johnson@woodsrogers.com

*Attorneys for Bence Horvath*

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed via CM/ECF on September 25, 2025, which provides notification to all counsel of record.

*/s/ Kristin B. Johnson*
Kristin B. Johnson